# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

William Eldredge,                              Civil No. 09-2018 (SRN/JSM)

               Plaintiff,

                                             **MEMORANDUM OPINION**

    v.                                            **AND ORDER**

City of St. Paul and
St. Paul Department of Fire and
Safety Services,

               Defendants.

_____

Adrianna Shannon & Steven Andrew Smith, Nichols Kaster, PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, Minnesota 55402, for Plaintiff

Louise Toscano Seeba & David H. Grounds, St. Paul City Attorney's Office, 15 West Kellogg Boulevard, Suite 750, St. Paul, Minnesota 55102, for Defendants

_____

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 152], Plaintiff's Motion to Exclude Expert Testimony [Doc. No. 158], and Plaintiff's Motion for Summary Judgment on Liability [Doc. No. 165].  For the reasons set forth herein, the motions are  denied.

## I.      FACTUAL BACKGROUND

       The City of St. Paul and the St. Paul Department of Fire and Safety Services ("Defendants") hired Plaintiff William Eldredge as a firefighter in 1994. (Compl. ¶ 10; Answer ¶ 10.)  Eldredge is an honorably discharged member of the United States Armed Forces, with which he had served as an officer for many years, holding such positions as intelligence analyst, civil affairs specialist, interrogator and radio communications officer.  (Eldredge Dep. at 14-17,

Defs.' Ex. 2; VPA Hrg. Tr. at 101, Defs.' Ex. 1.)[1]  He also holds a law degree and has worked as

an attorney.  (Id.; VPA Hrg. Tr. at 101, Defs.' Ex. 1.)

   In approximately 1991, Eldredge was diagnosed with a form of macular degeneration

known as Stargardt's Disease Macular Dystrophy, which causes a small blind spot in the center

of his field of vision.  (Compl. ¶ 8; see also Allen Report at 2, Ex. D to Pl.'s Daubert Mem.)

Eldredge is unable to read small print without magnification, has certain driver's license

restrictions, and experiences central field of vision distortion.   In February 2003, Plaintiff's

ophthalmologist, Dr. Joseph Terry indicated that Eldredge's corrected visual acuity in the right

eye was 20/200, and in the left eye was 20/40.  (VPA Hrg. Tr. at 138-39, Pl.'s Ex. 1.)

   During his fire training course with the City of St. Paul, Plaintiff commented on his eye

condition (Monogue Dep. at 37, Pl.'s Ex. 90), and although he took a preemployment physical,

his condition did not preclude his 1994 employment with Defendants.  (VPA Hrg. Tr. at 141-42,

Pl.'s Ex. 1.)   Despite his medical diagnosis, Plaintiff received positive reviews and/or informal

assessments of his work performance.  (Carter Dep. at 139, Pl.'s Ex. 95; Hogan Dep. at 25, Pl.'s

Ex. 96; Monogue Dep. at 42, Pl.'s Ex. 90; Butler Dep. at 39, Pl.'s Ex. 91; Cook Dec. ¶¶ 3-4;

Lecuyer Dec. ¶¶ 18-20; Performance Appraisal Report, Pl.'s Ex. 4.)  Former St. Paul Fire

Captain Dennis Goyette testified that when he supervised Eldredge during his tenure at

Company 23, Eldredge voluntarily completed a department-wide survey indicating that he did

---

[1]  References to Defendants' exhibits are to the exhibits filed in connection with
Defendants' Motion for Summary Judgment (Exs. 1-57 to the Affidavit of David H. Grounds
[Doc. No. 155]), unless otherwise noted.   References to Plaintiff's exhibits are to the exhibits
filed in connection with Plaintiff's Motion for Summary Judgment (Exs. 1-104 to the Affidavit
of Adrianna Shannon [Doc. No. 168].)   To the extent that the Court cites to any exhibits filed in
connection with Plaintiff's Daubert Motion (Exs. A-N to the Affidavit of Adrianna Shannon),
they are identified as such.

not wish to drive departmental vehicles. (VPA Hrg. Tr. at 98-99.)  Goyette further testified that

Eldredge completed the survey in that manner because 'he knew his limitations' and had safety

concerns about driving departmental vehicles.  (Id. at 99.)

In 2004, Defendants received a grant to conduct routine medical screenings which were

performed by occupational health physician Fozia Abrar.  (See Morehead Dep. at 42, Pl.'s Ex.

100; Haltiner Dep. at 53, Pl.'s Ex. 99.)  As part of the screening, in approximately July 2004,

Eldredge was to have his vision tested.  Dr. Abrar did not personally examine Plaintiff's eyes,

although Eldredge met with a nurse.  (VPA Hrg. Tr. at 295-96, Pl.'s Ex. 1; Eldredge Dep. at 164-

65, Defs.' Ex. 2.)  He objected to the form of the examination which involved a tube-like

examination instrument with which he had had difficulty in the past.  Eldredge contends after he

refused to look into the machine, the nurse did not complete the examination.  (Eldredge Dep. at

164-65, Defs.' Ex. 2.)  Although Dr. Abrar did not meet with Plaintiff, she nonetheless reviewed

his medical records and issued a report finding that Eldredge's corrected visual acuity was

20/200 in the right eye and 20/100 in the left eye.  (Letter of 7/29/04 from F. Abrar to A. Carter,

Pl.'s Ex. 6.)

Dr. Abrar completed a medical monitoring summary and recommended "no firefighting

or driving duties, pending further evaluation," and suggested an ophthalmology consultation.

(Medical Record, Pl.'s Ex. 5.)  In a letter sent to Assistant Fire Chief Tony Carter, Dr. Abrar

reiterated the recommendation of "no firefighting or driving duties." (Letter of 7/29/04 from F.

Abrar to A. Carter, Pl.'s Ex. 6.)  Dr. Abrar indicated that her recommendations were based on a

review of Plaintiff's medical records, Defendants' stated essential functions of the firefighter job,

and the National Fire Protection Association's ("NFPA") vision standards.[2]  (Id.)  Among the records she reviewed was a February 18, 2003 ophthalmology evaluation by Dr. Terry, who found that Plaintiff had corrected visual acuity of 20/200 in his right eye and 20/40 in his left eye.  (Id.)  As of May 2007, the City had not followed up on Dr. Abrar's recommendation that Eldredge consult with an ophthalmologist.  (Veteran's Pref. Hrg. Tr. at 38-39, Defs.' Ex. 1.)

## A.    Move to "Light Duty" Work

After receiving Dr. Abrar's recommendation, Assistant Fire Chief Anthony Carter met with Eldredge and his union representative to discuss Eldredge's employment.  (Carter Dep. at 59, 61-63, Pl.'s Ex. 95; Leitner Decl. ¶ 4.)  Eldredge recalls that Chief Carter informed him that it was "too bad" he could no longer be a firefighter, "'but maybe he could find something else to do.'"  (Eldredge Dep. at 263-64.)  Plaintiff told Carter that he was entitled to the protections of the Minnesota Veteran's Preference Act ("VPA") and also the Americans with Disabilities Act ("ADA").  (Id.)  Eldredge requested that he be permitted to work as a firefighter with the use of a hand magnifier for any incidental reading and requested permission to not drive departmental emergency vehicles.

Defendants assigned Eldredge to the Fire Department's training unit for "light duty" work on an interim basis, removing him from active firefighting duties.  (Holton Dep. at 68, Defs.' Ex. 8.)  Plaintiff testified that Assistant Fire Chief Jay Monogue told him that he did not qualify for the ADA because he was not sufficiently disabled and that Chief Carter rolled his eyes at the invocation of the ADA, saying "'just go with the training [position]' and that was it."

_____

[2]  The NFPA promulgates codes and standards applicable to several fields, including firefighting.  Defendants have not formally adopted the NFPA firefighting standards.  (Rule 30(b)(6) Dep. at 116-17, Pl.'s Ex. 97.)

(Id. at 263.)  Defendants do not have full-time permanent light-duty positions for personnel and

view a position in the training unit as temporary when, through disease or injury, firefighters are

unable to perform their primary job duties.  (Veteran's Pref. Hrg. Tr. at 39-40.)   Plaintiff,

however, testified in his deposition that he knew of at least one other former firefighter who was

assigned to a training position for approximately six or seven years until his eventual retirement.

(Eldredge Dep. at 264.)  Assistant Fire Chief Jay Monogue described the circumstances in which

firefighters were placed on light-duty assignment as more of a "mind-set" than a bona fide

policy.  (Veteran's Pref. Hrg. Tr. at 40.)  He stated that the policy was only written down insofar

as the City sent letters to affected employees notifying them of their change in status.  (Id. at 40-

41.)   In order to turn a temporary position into a permanent position, Chief Monogue stated that

the department would have to justify the need for the position to the City's budget office, write

job specifications for the position, advertise the position and interview applicants.  (Id. at 71-72.)

Fire Chief Timothy Butler conceded that transforming a temporary training position into a

permanent position was an "option," but it would require obtaining a waiver from the City's

finance director due to a hiring freeze.  (Butler Dep. at 114-15, Defs.' Ex. 10.)   Moreover, when

asked at his deposition if Eldredge could work as an audiovisual ("AV") technician, Chief Butler

testified that other departmental jobs needed to be created "over and above an AV technician

position," and while creating such a position was an option, "it's a very low priority option and

not likely to happen."  (Id. at 115.)

 While working in the training position, Plaintiff's supervisor, Deputy Chief of Training

Keith Morehead, testified that Plaintiff used his firefighter skills frequently.  (Morehead Dep. at

105, Pl.'s Ex. 100.)  He set up fire simulations, went into dark, smoky burning areas and

successfully maneuvered around, checked safety equipment and hauled mannequins into burn areas.  (Id. at 106-07.)  Assistant Chief Mike Hogan testified that Plaintiff facilitated live fire scenarios in their training building and videotaped such exercises.  (Hogan Dep. at 40-44, Pl.'s Ex. 96.)  Plaintiff's supervisors and colleagues found that he performed well in the training position.  Chief Morehead testified that Eldredge was "a great asset to the training division," describing him as productive, responsible and reliable, and as "someone who worked tirelessly on any kind of task that you would ask him to do."  (Morehead Dep. at 84-85, Pl.'s Ex. 100.)

In August 2006, Defendants scheduled a fitness-for-duty examination for Eldredge.  (Letter of 8/10/06 from D. Holton to B. Eldredge, Pl.'s Ex. 9.)  Occupational Health physician Chang-Jiang Zheng performed the examination.  (Medical record of 9/11/06, Pl.'s Ex. 10.)  Dr. Zheng reviewed "prior notes from ophthalmology clinic" and noted that Eldredge's vision was "20/70 in one eye and 20/100 in the other" and that his eye condition had been stable for two years.  (Id. at 1-2.)  He did not conduct an eye exam.  (Id. at 2, noting "eye exam deferred today.")  Dr. Zheng recommended that Eldredge return to work, subject to the restrictions of not driving a fire engine and not working in a safety-sensitive position.  (Id. at 2.)

## B.   Termination Notice:  November 14, 2006

In November 2006, Defendants sent notice of their intent to terminate Plaintiff's employment as a firefighter.  (Letter of 11/14/06 from D. Holton to B. Eldredge, Pl.'s Ex. 11.)  In the letter notifying Plaintiff of the intent to terminate, Fire Chief Holton referred to Dr. Zheng's recommendations, the NFPA standards, and the need for firefighters to have adequate vision to read essential information.  (Id.)  In light of his status as an honorably discharged military veteran, Eldredge was entitled to request a hearing on the reasonableness of his removal

6

pursuant to the Minnesota VPA, Minn. Stat. § 197.447.[3]

Prior to any hearing, Eldredge requested a meeting with Chief Holton to discuss the intent to terminate his employment. (Email of 11/21/06 from B. Eldredge to Holton, Pl.'s Ex. 12.) (Letter of 12/7/06 from Holton to B. Eldredge, Pl.'s Ex. 13.)  At the December 4, 2006 meeting, Eldredge stated that neither Dr. Abrar nor Dr. Zheng personally examined his eyes, and expressed his view that neither physician was qualified to provide an opinion on how his eye condition impacted firefighting.  (Email of 12/5/06 from J. Monogue to D. Holton, Pl.'s Ex. 14.) Eldredge stated that his objective was to return to work as an active firefighter, but if not that, to work in some capacity with the Fire Department.  (Id.)  He proposed finding a better-qualified doctor to provide an assessment of his condition as it related to firefighting.  (Id.)  Chief Holton indicated that even with any additional testing or evaluating, he would not overrule a physician's restrictions because of potential liability to the City.  (Veteran's Pref. Hrg. Tr. at 69, Defs.' Ex. 1.)  In Defendants' Rule 30(b)(6) deposition, Senior Human Resources Consultant Terry Haltiner testified that Defendants did not provide any job-related testing of Eldredge's work ability "[b]ecause his situation requires a medical opinion, it's a medical determination, and the medical

---

[3]  The Veterans' Preference Act provides that

No person holding a position by appointment or employment in the several counties, cities, towns, school districts and all other political subdivisions in the state, who is a veteran separated from the military service under honorable conditions, shall be removed from such position or employment except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges, in writing.

Minn. Stat. § 197.46.

providers determined that no further testing was required."  (Defs.' 30(b)(6) Dep. at 52-53.)

Following the December 4, 2006 meeting, Chief Holton communicated his intent to proceed with Eldredge's termination.  (Letter of 12/7/06 from D. Holton to B. Eldredge, Pl.'s Ex. 13.)  While Holton acknowledged Eldredge's plan to seek out a doctor more qualified to opine on his eye condition as it related to the work conditions, functions and standards of the firefighter position,  he also reminded Plaintiff of the 60-day period in which he needed to seek a hearing on the intent to terminate.  (Id.)

In April 2007, Optometrist Jenny O'Malley from the Phillips Eye Institute evaluated Eldredge's rehabilitation potential.  (Letter of 4/30/07 from J. O'Malley to W. Eldredge, Pl.'s Ex. 15.)  Dr. O'Malley examined Eldredge and recorded aided distance visual acuity of 20/200 for the right eye and 20/80 for the left eye.  (Id.)  She found that his unaided near visual acuity was 20/100, and with the aid of a 4x telescope and 20 diopter hand or stand magnifier, his vision improved to 20/25 or 1.0M.  (Id.)  She reviewed the vision requirements that Eldredge forwarded to her, which, as Eldredge testified, included the NFPA vision standards and the City's job description for the position of firefighter.  (Veterans' Pref. Hrg. Tr. at 226-27, Pl.'s Ex. 2.)  Dr. O'Malley recommended accommodations and a practical skills assessment:

> With the use of the devices listed above, Mr. Eldredge does meet the vision requirements he has forwarded to me.  Due to his vision loss, he does not meet the requirements for an unrestricted driver's license in the state of Minnesota.  Please evaluate his ability to perform the tasks associated with his position while using these devices.  Occupational Therapy was recommended and completed.

(Letter of 4/30/07 from J. O'Malley to W. Eldredge, Pl.'s Ex. 15.)  Defendant's Rule 30(b)(6) deponent Haltiner testified that Defendants did not implement O'Malley's suggestions because she was not an occupational health specialist.  (Rule 30(b)(6) Dep. at 135-36, Pl.'s Ex. 97.)

### C.      First Charge of Disability Discrimination Filed with MDHR

On April 27, 2007 Plaintiff filed his first charge of disability discrimination with the

Minnesota Department of Human Rights ("MDHR").  (Charge of Discrimination, Pl.'s Ex. 18.)

Eldredge claimed that the City's November 2006 intent to terminate him was discriminatory,

because with a reasonable accommodation, he could perform the essential duties of a firefighter.

(Id.)  He noted that the NFPA standards recommend an individualized evaluation for vision

disabilities and that the City had denied any such evaluation.  "Despite being aware that I am

able to successfully perform the essential duties of a firefighter and that my assignment as an

Audio Video Technician is a reasonable accommodation for my disability, the City has not

withdrawn its notice of intent to terminate me."  (Id.)

The MDHR found probable cause to credit Eldredge's allegations that Defendants sought

to terminate Eldredge on the basis of his disability and in violation of the Minnesota Human

Rights Act ("MHRA").  (MDHR Mem. at 3, Pl.'s Ex. 19.)   Specifically, the MDHR found

evidence sufficient to show that, by removing Eldredge from his firefighter position, Defendants

refused to allow him to perform the job using mitigating devices, as needed, for his visual

impairment.  (Id. at 2.)  "The greater weight of the evidence showed that the charging party was

a qualified disabled person, in that he is disabled and able to perform the essential functions of

being a firefighter and of being a Video Technician, with reasonable accommodation, as

needed."  (Id.)

### D.      St. Paul Civil Service Commission 2007 Ruling on the Merits

The St. Paul Civil Service Commission conducted the VPA Hearing on May 1, 2007 and

August 1, 2007 regarding Plaintiff's November 2006 termination notice.  The Commission issued

a ruling in Plaintiff's favor on December 3, 2007, finding that "[t]here was no convincing testimony to support that Mr. Eldredge is incompetent to perform the specific duties of a firefighter." (Findings of Fact, Conclusions & Order, Conclusion ¶ 5, Defs.' Ex. 17.)   The Commission acknowledged Dr. Abrar's testimony that Plaintiff's vision was not up to NFPA standards and her opinion that he could not lift or carry heavy objects, perform searching and finding and could not operate a fire engine or emergency vehicle in an emergency.  (Id. at ¶¶ 15-16, Defs.' Ex. 17.)  However, the Commission also noted that Abrar testified that that she did not know whether firefighters are required to operate emergency vehicles, nor did the City offer any other testimony to support these activities (driving, lifting or carrying of heavy objects, searching and finding) as requirements of the job.  (Id. ¶ 17.)  The Commission also found "There was testimony that the City of Saint Paul has not adopted NFPA standards, although it accepts some of the standards as guidelines.  No testimony was offered on the specific duties as a firefighter that Mr. Eldridge could not perform."  (Id. ¶ 8.)  Overall, the Commission concluded that "the testimony of Dr. Abrar was lacking in giving an accurate picture of Mr. Eldredge's vision capabilities or lack of capabilities"  (Id., Conclusion ¶ 1.)  The Commission concluded that the City had failed to meet its burden of showing that Eldredge was incompetent to work as a firefighter and overturned the City's decision to terminate him.  (Id. ¶ 4; and Order.)  Defendants did not appeal the Commission's decision.  (Rule 30(b)(6) Dep. at 226, Pl.'s Ex. 97.)

### E.    Management Audit

At some point in 2007, an outside firm conducted a management audit of the Fire Department after which Defendants formed an internal committee to propose action based on the auditor's recommendations.  (See Haltiner Dep. at 19-20, Pl.'s Ex. 99; Internal Audit Committee

Notes, Pl.'s Ex. 16.)  The auditor proposed that Defendants add an additional Training Assistant and AV/Technician position to the training division (Recommendation No. 103, Internal Audit Committee Notes at 2, Pl.'s Ex. 16), and replace the uniformed AV Technician with a civilian, through attrition (Recommendation No. 113, id..)  Retired St. Paul Fire Department Assistant Chief Michael Hogan testified that he believed the uniformed AV Technician referred to Mr. Eldredge and that Eldredge would have been qualified to be a training assistant.  (Hogan Dep. at 114-15, Pl.'s Ex. 96.)  The auditor's recommendations were not implemented.  (Id. at 116.)

    **F.**    **Suspension Due to Lack of Driver's License**

During the course of the Veterans' Preference Hearing, Defendants learned that Eldredge's Minnesota driver's license had expired in July 2004.  (See MN Driver License Record, Defs.' Ex. 18.)  The possession of a driver's license is a requirement for the position of firefighter and Defendants further require employees to notify their supervisors of the loss of any driving privileges.  (See City of St. Paul Policy, Pl.'s Ex. 23.)  Eldredge admitted to driving a non-City owned vehicle without a driver's license while employed by the St. Paul Fire Department for a certain period of time.  (Letter of 5/24/07 from R. Morrison to B. Eldredge, Defs.' Ex. 19.)  On May 24, 2007, Defendants gave Eldredge a 15-day suspension for driving without a license.  (Id.)  That same day, Defendants also communicated to Plaintiff that, having learned that his Minnesota license was "canceled" on May 21, 2007, he was placed on leave without pay for up to 120 days or until he could legally drive.  (Second Letter of 5/24/07 from R. Morrison to B. Eldredge, Defs.' Ex. 20.)

Eldredge remained on leave without pay and in December 2007, filed a petition for relief under the Veterans' Preference Act, contending that the City had refused his verbal and written

requests for a hearing regarding his suspension and leave, noting that a suspension of more than 30 days constitutes a termination under the VPA.  (Petition, Defs.' Ex. 23.)   Plaintiff contacted the Commissioner of Veteran's Affairs, who scheduled a hearing for February 2008.  (Compl. ¶ 30.)  In approximately July 2007, Plaintiff ultimately obtained a Wisconsin driver's license, because at that time and through the present, he maintained a permanent residence in Wisconsin. (See Rule 30(b)(6) Dep. at 39; Charge of Discrimination of 2/14/08, Pl.'s Ex. 35.)

### G.    September 24, 2007 Termination Notice:

On September 24, 2007, after the expiration of Plaintiff's 120-day unpaid leave period, Defendants issued yet another termination notice.  (Letter of 9/24/07 from R. Morrison to W. Eldredge, Pl.'s Ex. 28.)  Defendants stated that Plaintiff's job classification required a "license that is valid for driving in the State of Minnesota," and because Eldredge did not possess such a license, the City intended to take action in terminating him.  (Id.)  Defendants apparently believed that a Wisconsin driver's license did not meet their requirements, as Terry Haltiner described the grounds for this notice of intent to terminate as "our intent to terminate your employment because of your failure to present a driver's license that is valid in the State of Minnesota."  (Email string of 10/3/07, Pl.'s Ex. 29.)   In Eldredge's communications with Defendants to resolve the September 2007 termination notice, he expressed his view that withholding his pay was illegal and reiterated his position that "with minor accommodations, I can perform the firefighter job." (Id.)

### H.    Second Charge of Disability Discrimination Filed with MDHR

In February 2008, Plaintiff filed a second charge of discrimination with the MDHR, alleging disability discrimination based on Defendants' actions related to his driver's license.

(Charge of Discrimination of 2/14/08, Pl.'s Ex. 35.)  In the charge, Eldredge expressed his belief that disability and reprisal were factors in Defendants' actions.  (Id. at 2.)  He noted that after he filed his initial charge of discrimination against Defendants, he was removed from his AV/Technician position and placed on unpaid leave.  (Id.)  The MDHR completed an investigation of Eldredge's charge, finding that probable cause existed to believe that Defendants committed an "unfair discriminatory practice." (Letter of 4/3/09 from V. Korbel to W. Eldredge, Pl.'s Ex. 36.)  The MDHR referred the matter to the Minnesota Attorney General's Office in order to schedule a conciliation conference.[4]  (Id.)

While the VPA hearing on Plaintiff's suspension was pending, Defendants contacted him about returning to work.  Acknowledging the St. Paul Civil Service Commission's ruling in Eldredge's favor on the earlier termination attempt, Defendants distinguished the pending VPA hearing on Eldredge's driver's license-related suspension as a "separate and distinct issue." (Letter of 12/21/07 from T. Haltiner to B. Eldredge.)  However, before Eldredge could return to work, Defendants required that he submit to a fitness-for-duty exam.  (Id.)  Plaintiff refused to sign medical release forms, and after Plaintiff contacted the fitness-for-duty examining doctor prior to the examination, the doctor canceled the appointment and it did not occur.  (See Letter of 2/1/08 from T. Butler to W. Eldredge, Pl.'s Ex. 38.)

---

[4] While this matter was ultimately resolved, in the course of MDHR's investigation, the MDHR interviewed St. Paul Fire Department Training Assistants who spoke in Plaintiff's favor, which Terry Haltiner ultimately communicated to Chief Butler.  (Butler Dep. at 283-86, Pl.'s Ex. 92.)  Chief Butler later expressed to Chief Morehead, who led the Training Division, words to the effect of 'your training staff better hope that they don't have to sit in front of me for any kind of promotional interview because they're going to be – they're going to regret what they said.' (Morehead Dep. at 75, Pl.'s Ex. 100.)  At least one of the Training Division staff members who had spoken in Eldredge's defense was passed over for a promotion.  (Morehead Dep. at 162-63, Pl.'s Ex. 101.)

On January 6, 2008, Eldredge requested a VPA Hearing on the September 24, 2007 termination notice, and reiterated a request to be returned to the payroll, with back pay and benefits from the start of his involuntary unpaid leave that began on May 24, 2007.  (Letter of 1/6/08 from B. Eldredge to S. Wegwerth, Pl.'s Ex. 30.)  In addition, Eldredge expressed his belief that the City's refusal to return him to his light duty in the Training Division until he passed a fitness-for-duty examination was retaliatory.  (Id. at 1.)  Finally, Eldredge addressed his request for accommodation:

> The City consistently refused to consider accommodating my disability. I've shown that I can do the job of firefighter at Station 23 and at the Training Division. The City has consistently refused to give me a practical test of the actual tasks (essential functions) of the firefighter job, such as has been given to others on the Fire Department.  Under the ADA, mere identification of a medical condition is insufficient to terminate an employee.
>
> With reasonable accommodation I can continue to work as a firefighter.  Please consider my requests in accordance with the Americans with Disabilities Act, the Veterans' Preference Act, and other laws.  Also, pending resolution of the issues involved in the City's efforts to terminate me, please reinstate me on paid status, including back pay and benefits from May 25th 2007.

(Id. at 2.)

On January 14, 2008, Defendants' Human Resources Consultant Haltiner contacted both the St. Paul Police Department and the Minnesota Department of Motor Vehicles ("DMV") with questions relating to Eldredge's driving status.  Haltiner essentially asked the same question of both agencies:

> I have an employee, with the St. Paul Fire Dept., who is required to have a [driver's license].  As of May 21, his [driver's license] was listed as canceled.  I believe due to failure to pass the eye exam.  He has since gotten a Wisc [driver's license] that restricts his driving to daylight hours.  I know there is a statute that states if you are canceled or revoked in Minn and get a [driver's license] in another state, you still cannot legally drive in Minn.  I need to know if this individual can

legally drive in Minn. Who can tell me?

(Email string of 1/14/08 between T. Haltiner and DMV, Pl.'s Ex. 32; Email string of 1/14/08 between T. Haltiner and G. Pye, Pl.'s Ex. 31.)  An employee from the Department of Motor Vehicles responded, stating, "Our records show that we received the requested information and so [Eldredge's] driving privileges have been reinstated in Minnesota."  (Email string of 1/14/08 between T. Haltiner and DMV, Pl.'s Ex. 32.)  A St. Paul Police Officer responded to Haltiner's inquiry, informing him that Eldredge's driving privileges were reinstated on January 8, 2008, stating, "I would say that since his Minn. driving privileges have been reinstated here in Minn. and he has presented a valid Wisc. [driver's license] to you, he would meet [the] requirements of his job."  (Email string of 1/14/08 between T. Haltiner and G. Pye, Pl.'s Ex. 31.)

On January 16, 2008, Defendants retroactively returned Eldredge to work, effective January 7, 2008, and assigned him to light duty work at the Department's headquarters.  (Letter of 1/16/08 from T. Haltiner to W. Eldredge, Defs.' Ex. 25.)  In light of the resolution of Plaintiff's driver's license issues and related pay concerns, Plaintiff's MHRA charge was considered settled and the file was closed.  (Letter of 4/28/08 from B. Johnson to C. Dyrud, Defs.' Ex. 29.)

### I.      Reprimand for Refusal to Sign Medical Releases

On February 1, 2008, Chief Butler reprimanded Plaintiff in writing, stating that his refusal to sign medical releases was unacceptable, and that his phone call to the doctor with whom Defendants had scheduled his fitness-for-duty examination was likewise unacceptable.  (Letter of 2/1/08 from T. Butler to W. Eldredge, Pl.'s Ex. 38.)  Chief Butler ordered Plaintiff to sign the applicable medical release forms.  (Id.)  Eldredge responded by letter the following day, stating that he spoke by telephone with Dr. Flood, Defendants' identified fitness-for-duty examining

physician, and offered to sign medical releases directly to him, but Dr. Flood declined.  (Letter of

2/1/08 from W. Eldredge to T. Haltiner, Pl.'s Ex. 40.)   Eldredge wrote that Defendants supplied

the releases at the end of the day on January 24 and requested that they be returned the following

day.  He further explained, "You stated that they were for Dr. Flood, but they were actually

addressed to a 3rd party, a medical clearing house, and further stated that my information could be

disclosed to others and would no longer be afforded privacy protection."  (Id.)

In his deposition, Eldredge explained that he refused to sign Defendants' 2008 medical

release forms for inherent deficiencies, such as being overly broad in scope, not specifying the

recipient, and allowing the release of information to third parties.  (Eldredge Dep. at 146, Defs.'

Ex. 2.)  "I never made any decision not to release medical information.  I simply made a decision

not to sign forms which violated my rights or were deficient in some other way."  (Id.)   Eldredge

was particularly sensitive to the unauthorized release of his medical records and recounted at his

deposition how, at his VPA Hearing, Dr. Abrar had full access to his records and read them into

the record at the hearing, despite Eldredge's claim that he had never authorized the release of the

records to her.  (Id. at 155.)

On March 12, 2008, Chief Butler wrote to Plaintiff, acknowledging his pending VPA

hearing, and conceding that Eldredge's driving privileges had been reinstated on January 8, 2008.

Butler therefore questioned whether 'it made sense' for Eldredge to pursue the scheduled VPA

hearing.  (Letter of 3/12/08 from T. Butler to W. Eldredge, Pl.'s Ex. 33.)   Butler nevertheless

stated that Defendants required additional documentation concerning Plaintiff's driving privileges

and unless Plaintiff provided that information, Butler could not rescind the September 24, 2007

notice of intent to terminate.  (Id.)  Moreover, Butler informed Plaintiff that his failure to provide

16

the documentation by April 1, 2008 would constitute insubordination and grounds for discipline. (<u>Id.</u>)

Eldredge responded by letter on March 28, 2008, informing Chief Butler that he had contacted DMV authorities who informed him that the only information they received in January 2008 was the submission of Eldredge's change of address in Wisconsin.  (Letter of 3/28/08 from W. Eldredge to T. Butler, Pl.'s Ex. 34.)  Eldredge also indicated that while Minnesota DMV authorities were unwilling to provide any written documentation, they would be willing to speak with Chief Butler to verify Minnesota's recognition of his out-of-state license and reinstatement of Minnesota driving privileges.  (<u>Id.</u>)  Eldredge demanded that Defendants rescind the termination notice without further delay, discontinue their repeated efforts at termination, and instead accommodate him as a qualified disabled person.  (<u>Id.</u>)

On April 14, 2008, Defendants scheduled a fitness-for-duty examination for Plaintiff with Dr. Joseph Terry, a University of Minnesota ophthalmologist whom Plaintiff had seen several years earlier, and a second medical examination with Dr. Charles Hipp.  (Letter of 4/14/08 from A. Nalezny to W. Eldredge, Pl.'s Ex. 41.)  The following day, Chief Butler sent a letter to Plaintiff in which he acknowledged the two pending exams and ordered Plaintiff "to keep these appointments and cooperate with the doctors.  You are not to contact these doctors before the exams." (Letter of 4/15/08 from T. Butler to W. Eldredge, Pl.'s Ex. 42.)  Chief Butler also attached five medical release forms and ordered Eldredge to sign them, stating, "failure to follow these orders will be considered to be insubordination and grounds for discipline."  (<u>Id.</u>)

Eldredge responded to Chief Butler's letter on April 17, 2008, expressing his willingness to assist Defendants and medical personnel in devising a practical fitness-for-duty examination.

(Letter of 4/17/08 from W. Eldredge to T. Butler, Pl.'s Ex. 43.)  Also, Eldredge expressed his view that the order prohibiting him from communicating with the two doctors assigned to examine him was not legal.  As to Chief Butler's directive that he sign the medical releases, Eldredge stated that the release of medical information was voluntary pursuant to City policy and he viewed any discipline for his failure to sign the forms as a form of retaliation.  Eldredge emphasized his desire to work with Defendants to obtain reasonable accommodation: "The City has attempted to terminate me three times, but has consistently refused to offer skills testing.  The City has also refused to accommodate my disability under the ADA, in accordance with the NFPA guidelines for incumbent firefighters."  (Id.)  He identified reasonable accommodation to include permission to use a magnifying glass for any incidental reading as a firefighter and not requiring him to drive emergency vehicles, or allowing him to work in the training position that he had previously held.  (Id.)  "To date, the City's only response to my repeated requests for accommodation was ex-Fire Chief Holton's absolute refusal to consider it." (Id.)

On April 28, 2008, Chief Butler transferred Eldredge from the Training Division to department headquarters, where he was to work on strategic plan implementation, including computer data mining.  (Email string between T. Butler and K. Morehead, Pl.'s Ex. 45.)  Keith Morehead, Plaintiff's supervisor in Training, communicated his unhappiness about this transfer to the Chief, stating, "This is a very disappointing development.  Bill was a crucial factor in developing our recent highly successful 'Post Incident Review' Powerpoint format.  He is physically healthy and strong, allowing him to assist us daily with recruit academy practicals." (Id.)  In his deposition, Chief Morehead testified that assigning Mr. Eldredge to perform data mining constituted a "total disregard of Bill's injury or problem," explaining that given

18

Eldredge's problems with eye strain, it made no sense to have Eldredge read reports eight hours a day.  (Morehead Dep. at 87-88., Pl.'s Ex. 100.)  Morehead testified that although he did not know Defendants' precise motivations for transferring Eldredge, ". . . the way it is perceived or observed is that they were trying to force Bill out or they were trying to make Bill – tip Bill over, frustrate Bill to the point that he couldn't take it anymore, and that was wrong.  We shouldn't treat our employees that way."  (Id. at 88.)

On April 28, 2008, Angela Nalezny, St. Paul's Director of Human Resources, responded to Eldredge's April 17, 2008 letter regarding the medical releases and fitness-for-duty exam. (Letter of 4/28/08 from A. Nalezny to W. Eldredge, Pl.'s Ex. 47.)  Ms. Nalezny stated that Eldredge's requests for accommodation were under consideration.  (Id. at 1.)  She included medical releases directing the release of medical records to Defendants' fitness-for-duty evaluators/medical personnel and stated that until the completion of the evaluations, Defendants could not consider any of Plaintiff's requests for accommodation.  (Id. at 2.)  Chief Butler followed up with a letter on May 6, 2008, ordering Eldredge to deliver all of the signed release forms to Terry Haltiner by May 9, 2008, and to keep the two medical appointments.  (Letter of 5/6/08 from W. Eldredge to T. Butler, Pl.'s Ex. 48.)

Eldredge responded by letter on May 7, 2008, acknowledging Ms. Nalezny's representation about the City considering Plaintiff's requests for accommodation:  "This is the first time in the four years since the City first attempted to terminate me that the City has not categorically denied accommodation."  (Letter of 5/7/08 from W. Eldredge to A. Nalezny, Pl.'s Ex. 49.)  Eldredge further stated that he did not intend to sign the medical releases, as doing so was apparently voluntary under City policy, and because the City possessed sufficient medical

information about his condition to determine the necessary accommodation.  (Id. at 2.)

Ms. Nalezny responded, stating that without medical releases, which would include the release of information from Dr. O'Malley at the Phillips Eye Institute, it would be impossible for the City to take such opinions into consideration.  (Letter of 6/6/08 from A. Nalezny to W. Eldredge, Pl.'s Ex. 50.)  Citing the ADA and the MHRA, Ms. Nalezny indicated that the City considered his refusal to provide the requested medical releases an obstruction of the City's effort to make a reasonable accommodation, if available.  (Id.)  Ms. Nalezny concluded by stating, "Please be on notice this [your refusal to sign the medical releases] will likely be a decision to terminate your employment."  (Id.)

On June 24, 2008, Plaintiff attended a fitness-for-duty evaluation that Defendants had scheduled with Dr. Terry, and on July 17, 2008, Plaintiff attended another fitness-for-duty examination with occupational health physician Charles Hipp.  (See Medical Records, Pl.'s Exs. 51-55.)  Dr. Terry reviewed the NFPA 1582 standard and found that Plaintiff would not be able to operate a motor vehicle without a restricted license and that his central macular atrophy would limit his visual recovery in responding rapidly to changing visual stimuli.  (Medical Record, Pl.'s Ex. 51.)

Dr. Hipp concluded that Plaintiff "clearly does not meet the NFPA 1582 far visual acuity standard.  The condition is permanent and will not improve.  I do not recommend further testing." (Medical Records, Pl.'s Ex. 52.)  Dr. Hipp opined that Plaintiff would be an excellent candidate on a fire team to work as a video recorder, and noted, "I also believe that he can perform all of the functions of his training position that he did successfully for several years before his recent time off of work.  I don't believe that his visual impairment would be an issue in working as a trainer."

(<u>Id.</u> at 2.)

**J.      February 9, 2009 Notice of Intent to Terminate:**

On February 9, 2009, Defendants issued a third notice of intent to terminate, based on the evaluations of Dr. Hipp in 2008, Dr. Zheng in 2006, and Dr. Abrar in 2004.  (Letter of 2/9/09 from T. Butler to W. Eldredge, Pl.'s Ex. 56.)   Defendants concluded that "[o]ver the past four years it has become evident that your condition has not improved.  Based on your condition, these most recent medical examinations and the highly safety-sensitive nature of your job to the public and your coworkers, we clearly can no longer assign you to firefighting duties."  (<u>Id.</u>)

**K.      St. Paul Civil Service Commission 2009 Ruling**

After Plaintiff requested a VPA Hearing regarding Defendants' February 2009 intent to terminate, the St. Paul Civil Service Commission issued an order of summary disposition stating that it had previously decided the matter and that Defendants were prohibited from attempting to terminate Plaintiff based on his disability.  (2009 Civil Service Comm'n Order and Mem., Pl.'s Ex. 59.)  The Commission specifically found that the more recent medical records submitted by the City were not materially different from those submitted in connection with the 2007 hearing and that Defendants were not entitled to a "do-over."  (<u>Id.</u> at NKA000131.)  Rather, the Commission found that "[i]t would be inequitable and inefficient to allow the City to engage in 'expert shopping', jumping from expert to expert until it finds one that either agrees with its position or is deemed to be credible by the Commission."  (<u>Id.</u>)  The Commission acknowledged Defendants' argument that because Eldredge refused to provide medical releases, they were not given a full and fair opportunity to be heard before the Commission in 2007.  (<u>Id.</u> at NKA000132.)  However, the Commission found that "while the City makes this argument, it

21

tellingly has not alleged that Mr. Eldredge was <u>obligated</u> to provide any such medical releases or other background information – nor have they cited any policy, procedure or legal authority requiring him to do so." (<u>Id.</u> at NKA000132-33) (emphasis in original).

Defendants appealed the Commission's ruling to the Ramsey County District Court, which found their appeal untimely and ordered "immediate reinstatement of Eldredge to his employment with the St. Paul Fire Department." (Order in <u>City of St. Paul v. Eldredge</u>, File No. 62-CV-0910390 (Minn. Dist. Ct. Jan. 13, 2010), Pl.'s Ex. 61.) After Defendants appealed that ruling to the Minnesota Court of Appeals, the appellate court reversed and remanded, finding that the deadline for filing the appeal was governed by a longer period for civil service review, rather than by a statute establishing a deadline for appeals under the VPA. <u>Saint Paul v. Eldredge</u>, 788 N.W.2d 522, 529 (Minn. Ct. App. 2010). The Minnesota Supreme Court recently affirmed the ruling of the Minnesota Court of Appeals, remanding the matter to the Ramsey County District Court. <u>Saint Paul v. Eldredge</u>, ___ N.W.2d ___, 2011 WL 3111949, at *7 (Minn. July 27, 2011).

**L.     Defendants Assign Eldredge to Work From Home**

Defendants ultimately removed Plaintiff from the workplace altogether for a 19-month period, assigning him to work from home. (Rule 30(b)(6) Dep. at 178-79, 227, Pl.'s Ex. 97.) During this time, Defendants assigned Human Resources Consultant Haltiner to supervise Plaintiff while he was not permitted to work, giving Haltiner authority to control 'where Plaintiff can work, when he can work and how often he must check in.' (Butler Dep. at 102-04, Pl.'s Ex. 91.) Haltiner required Plaintiff to report to his office once a week to advise him of whether Defendants had any work "available within your restrictions." (Letter of 5/13/10 from T. Haltiner to W. Eldredge, Pl.'s Ex. 63.) Further, Haltiner reminded Eldredge, "You are not to be at Fire

Department worksites unless assigned by me." (Id.)  In addition, Haltiner informed Eldredge that his hours of work (at home) would be from 8:00 to 4:30, Monday through Friday, and that if he needed to attend depositions or any activities related to his litigation against the City, he would be required to request vacation time.  (Id.)  In response, Eldredge told Haltiner that "Your requiring me to report for duty weekly only to be told 'we have no work meeting your restrictions' and 'we have no long-term light duty' is another example of continued discrimination, as well as being demeaning and demoralizing.  As I have suggested, if you have no work, a simple phone call or email would suffice."  (Letter of 6/20/10 from B. Eldredge to T. Haltiner, Pl.'s Ex. 66.)  Eldredge also reiterated his previous requests for accommodation.  (Id.)

**M.     NFPA Standards and Practical Skills Testing**

In 2008, Chief Morehead, Plaintiff's Training Division supervisor, independently researched NFPA standards relating to vision and contacted Carl Peterson, an NFPA staff liaison, with interpretation questions.  (Morehead Dep. at 48, Pl.'s Ex. 100.)  Morehead asked Peterson a series of questions in an email exchange, including whether "members," [veteran firefighters] must meet the same NFPA standards that "candidates" are expected to meet, and what the appropriate process would be by which to evaluate whether a firefighter with visual deficits could perform essential job tasks.  (Email string between K. Morehead and C. Peterson at 3, Pl.'s Ex. 73.)  Based on his communications with NFPA's Peterson, Morehead concluded that Defendants were applying the wrong NFPA standards to Eldredge.  (Morehead Dep. at 52-53, Pl.'s Ex. 100) (noting that "candidates" are evaluated against the requirements of Chapter 6, while a "member" who develops an illness or injury is evaluated against a specific section of Chapter 9 concerning that medical problem).   Citing NFPA Sections 4.2 and 9.3, Peterson informed Morehead that for

"members" requiring an evaluation due to illness or injury,  a fire department physician is responsible for determining if a medical condition affects the firefighter's ability to safely respond to emergencies, "based on the ability to perform essential job tasks."  (Email string between K. Morehead and C. Peterson at 3, Pl.'s Ex. 73.)  "The standard requires the fire department to determine possible accommodations for members restricted from certain job tasks." (Id.) Morehead forwarded this information to his superiors, Chiefs Hogan and Butler, and to Haltiner.  (Id. at 1.)  He appealed to Butler to give further consideration to Eldredge's situation and to give him a practical skills test – a request he had made to Butler's predecessors and which had been denied:

> Bill has already been terminated once and is working now only because he won his hearing.  I am not in favor of mindlessly placing Bill back on the street as a firefighter.  I have told Bill that I would be the first to tell him he cannot continue if he truly could not do the job.  His treatment has been, and continues to be not only inconsistent with NFPA guidelines, but I believe it too is wrong.

(Email of 2/18/08 from K. Morehead to T. Butler at 1-2, Pl.'s Ex. 81.)  Butler did not respond to Morehead's email.  (Morehead Dep. at 65, Pl.'s Ex. 100.)  Morehead then developed a practical skills test for Plaintiff based on his understanding of Defendants' requirements and the NFPA's standards.  (Id. at 65-73.)  After presenting the practical skills test to Chief Butler, he approved it and was in favor of Eldredge undergoing the test, although, according to Morehead, Butler thought "that City Hall was hesitant to let Bill take the evaluation because they feared he would pass it."  (Id. at 78-79.)  Morehead's efforts to continue to press for this test did not produce any results.  (Id. at 83-84.)  Morehead was threatened with demotion by Chief Butler, which Morehead believes was retaliation for his support of Eldredge.  (Morehead Dep. at 155-57, Pl.'s Ex. 101.)  He eventually took a voluntary demotion.  (Id. at 157-58.)

Terry Haltiner testified in the Rule 30(b)(6) deposition that Defendants denied Plaintiff's request for individualized practical skills testing because Dr. Hipp said it would not be needed. (Rule 30(b)(6) Dep. at 52-53.)  Although Dr. Hipp recommended no further testing in his written evaluation, he testified that he did not intend for that to mean that Defendants could not perform any practical skills testing.  (Hipp Dep. at 39-40, 65, Pl.'s Ex. 104.)

Plaintiff eventually scheduled his own practical skills testing, performed on May 26-27, 2010 at Lansing Community College under the evaluation of Jeffrey Huber, Professor of Fire Science.  (Letter & Expert Report of J. Huber, Pl.'s Ex. 87.)  Huber compiled video footage of Eldredge's performance and also produced a report finding that Plaintiff successfully performed the essential functions of skills outlined in the NFPA standards and on Defendants' list of essential firefighter functions.  (Id.)  After completing this practical assessment, Eldredge forwarded the report and video footage to occupational health physician expert Dr. V.M. Van Nostrand, who performed an independent medical evaluation. (Van Nostrand Report, Pl.'s Ex. 88.)  Dr. Van Nostrand reviewed the materials from Professor Huber, Plaintiff's medical history, the NFPA essential functions and vision standards, and Defendants' essential functions of the firefighter position.  He also conducted a vision and physical examination and concluded that Plaintiff is able to perform the essential functions of the firefighter position with reasonable accommodations.  (Id. at 17.)  Dr. Van Nostrand recommended that Plaintiff not drive an emergency vehicle and he endorsed the use of a magnifying glass for any reading.  (Id.)

Defendants' Rule 30(b)(6) deponent Haltiner agreed that prior to 2009, Defendants had never conducted an interactive process to evaluate whether reasonable accommodations could be

provided for plaintiff.[5]  (Rule 30(b)(6) Dep. at 130.)  Haltiner also stated that he was unaware of whether any doctors had reviewed Eldredge's file or examined him to determine whether reasonable accommodations were possible.  (Id. at 131.)

## II.   PROCEDURAL HISTORY

Plaintiff filed this suit on August 3, 2009, alleging violations of the ADA (disability discrimination, failure to accommodate, retaliation and coercion), the ADA Amendments Act (disability discrimination and failure to accommodate), and the Minnesota Human Rights Act (disability discrimination, failure to accommodate and reprisal).  Defendants move for summary judgment, arguing that Plaintiff's claims fail as a matter of law because Eldredge cannot perform the essential functions of a firefighter, his requested accommodation creates an undue hardship, permanent light-duty work does not exist, and that Plaintiff cannot show that he has suffered any adverse employment impact.  In addition, Defendants argue that the use of certain NFPA visual acuity standards for the firefighter position is a business necessity and that allowing Eldredge to fight fires in contravention of those standards would pose a threat to his personal safety.  Finally, Defendants contend that Plaintiff cannot show that the City retaliated against him.

Plaintiff also moves for summary judgment, arguing that he has demonstrated, as a matter of law, that he is disabled and is able to perform the essential functions of a firefighter with or without reasonable accommodation.  In addition, Plaintiff contends that he has demonstrated adverse employment action because of his disability and that Defendants are unable to show that

---

[5] Haltiner is also Defendants' assigned ADA Accommodation Coordinator.  (Haltiner Dep. at 46, Pl.'s Ex. 99.)  Since 2006, when Haltiner began working with the Fire Department, other firefighters or prospective firefighters have expressed their belief that either Haltiner personally, and/or Defendants in general, have been terminating firefighters or forcing them into disability retirement.  (See Decl. of Pat Flanagan ¶¶ 6-8; Decl. of Bill Simmons ¶ 7; Decl. of Floyd Lecuyer ¶ 27.)

they cannot reasonably accommodate him.  As to his retaliation claims, Plaintiff contends that he has demonstrated that in response to his protected conduct, Defendants retaliated against him by changing his time records and taking his vacation benefits or pay when he was involved in litigation.

In addition, Plaintiff seeks to exclude Defendants' medical experts' proposed testimony and reports, arguing that they fail to meet the requirements of Fed. R. Civ. P. 702 and are neither reliable nor relevant.  Plaintiff argues that the proposed testimony is not relevant because its purpose is to prove arguments barred by the doctrine of collateral estoppel.  In addition, Eldredge argues that the proposed expert testimony is unreliable because the tests were not administered according to accepted methodology, the results do not reflect the actual data collected from completed testing, and the experts' conclusions are based on speculation without a factual foundation.

## III.   DISCUSSION

### A.   Summary Judgment Motions

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Id.   All justifiable

inferences are to be drawn in the non-movant's favor and the evidence of the non-movant is to be

believed. Id. at 255.

### 1.     Disability Discrimination Claims

The ADA and the MHRA prohibit an employer from taking an adverse action against an

employee because of the employee's disability.  42 U.S.C. § 12112(a); Minn. Stat. § 363A.08,

subd. 2.  Plaintiff's claims under both the ADA and MHA are analyzed under the McDonnell

Douglas burden shifting analysis.  Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 n.4 (8th

Cir. 2007) (referring to McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  To establish a

prima facie case of disability discrimination under this framework, Eldredge must show that: (1)

he had a disability within the meaning of the ADA and the MHRA; (2) he was qualified to

perform the essential functions of his job, with or without reasonable accommodation, and (3) he

suffered an adverse employment action because of his disability.  Finan v. Good Earth Tools, Inc.,

565 F.3d 1076, 1079 (8th Cir. 2009).

### a.     A "Disability" Within the Meaning of the ADA and MHRA

The first element of Plaintiff's disability claim is not in serious dispute.  The ADA defines

disability in the following three ways: "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1). The

MHRA is "less stringent," requiring that an impairment only "materially limit a major life

activity."  Liljedahl v. Ryder Student Transp. Servs., Inc., 341 F.3d 836, 841 n.3 (8th Cir. 2003).

"[A] disability must be permanent or long term, rather than temporary or transitory, to qualify a

person for protection against discrimination." Dixon v. Mount Olivet Careview Home, 09-1099

(MJD/AJB), 2010 WL 3733936, at *7 (D. Minn. Sept. 17, 2010).  As to the determination of

whether an impairment substantially limits a major life activity, such a determination

> [S]hall be made without regard to the ameliorative effects of mitigating measures such as--
>
>> (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses). . .;
>> (II) use of assistive technology;
>> (III) reasonable accommodations or auxiliary aids or services; or
>> (IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(E)(i)(I)-(IV).

Here, the record is unequivocal that Eldredge has been diagnosed with Stargardt's

Macular Dystrophy, a progressive disease, causing a small blind spot in the center of his vision,

which negatively impacts his central acuity vision.   Stargardt's Disease is a permanent, long-term

condition.   Recurring evidence in the record shows vision scores of 20/200 in Eldredge's left eye,

with Defendants' expert Dr. Allen scoring 20/200 in both eyes in July 2010.  (See, e.g., Allen

Report of 7/2/10 at 2, Pl.'s Ex. E to Daubert Mem. [Doc. No. 161-1].)  While Eldredge's vision

has been deemed stable for several years, the record shows that it will not reverse itself or

improve.  Mitigating measures that Eldredge uses or proposes to use include a magnifying glass

and/or a pocket telescope.  As noted above, the use of such equipment is not part of the

determination of whether a condition substantially limits a major life activity, nor is there any

evidence to suggest here that the temporary use of such devices addresses Eldredge's overall

visual impairment in the way in which corrective lenses might resolve nearsightedness.  See Sicard

v. City of Sioux City, No. 98-3799, 2000 WL 688223 (8th Cir. 2000) (Firefighter applicant,

whose nearsightedness could be corrected to a 20/20 visual acuity level with corrective lenses

was not "disabled" within the meaning of the ADA).

The MDHR, examining the same facts that form some of the bases of Eldredge's claims

here, has twice found him to be disabled within the meaning of the MHRA.  (See 2008 MDHR

Mem. at 1, Pl.'s Ex. 19; 2009 MDHR Mem. at 1, Pl.'s Ex. 36.)  While Defendants do not

necessarily concede that Eldredge is disabled, in their motion for summary judgment they focus

their argument on the other two elements of the McDonnell Douglas test and do not seriously

contest the question of disability.  (See Defs.' Summ. J. Mem. at 15.)  Based on the record, and

viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has

established that he is "disabled" within the meaning of the ADA and MHRA.

### b.    Qualified to Perform Essential Functions of the Job

> The determination of whether an employee is qualified to perform the essential
> functions of a job involves a two step inquiry. First the employee must show that
> she meets the necessary prerequisites for the job, and then she must demonstrate
> that she can perform the essential functions, with or without reasonable
> accommodation. If the employee establishes that she cannot perform the essential
> functions of the job without accommodation, she must also make a facial showing
> that reasonable accommodation is possible and that the accommodation will allow
> her to perform the essential functions of the job.

Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003) (citations omitted).  To first

determine if Eldredge is "qualified" to perform the essential functions of the job, he must

demonstrate that he meets the "requisite skill, experience, education and other job-related

requirement of the employment position [that he] holds or desires."  29 C.F.R. § 1630.2(m).

Defendants concede that Eldredge meets the basic requirements of the firefighter position, not

simply because they employed him in that capacity for several years, but as their Rule 30(b)(6)

witness Haltiner conceded, "The qualifications listed on the application, the testing, the education

he meets clearly." (Rule 30(b)(6) Dep. Tr. at 31, Pl.'s Ex. 97.) The Court finds that Eldredge meets the necessary prerequisites to qualify for the firefighter position.

At the next step of the analysis, Eldredge argues that he is qualified to perform the essential functions of the job with or without accommodation. Under the ADA, "[a]n individual is qualified if he satisfies the requisite skill, experience, education, and other job-related requirements and 'can perform the essential job functions, with or without reasonable accommodation.'" Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007) (quoting Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000)). An employer bears the burden of showing that a particular function is essential. See Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995). "Essential functions of the job are fundamental job duties, and the employer's judgment in this regard is considered highly probative." Duello v. Buchanan Cnty. Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010) (citation and internal quotation marks omitted). A job function may be considered essential for any of several reasons, including that "the reason the position exists is to perform that function;" there are a limited number of employees available among whom the performance of that job function can be distributed; or the function may be "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2).

In this case, from a list of seventeen numbered "Duties and Essential Functions," the following essential functions are described as "functions that the individual holding the position must be able to perform unaided or with the assistance of a reasonable accommodation:"

1.      Responds to fires and emergency calls with a company; connects and
        handles hose lines and nozzles; places or hoists ladders; turns water on or

off; uses axes, bars or hooks as appropriate, and utilizes chemical extinguishers or hoses to extinguish a fire.

2.    Ventilates burning buildings by opening or breaking doors or windows or cutting holes through walls, floors and/or roofs; and forces entry by breaking glass, springing or forcing doors, windows, or gates, cutting locks, bars, or wire grating, or breaking walls using appropriate safety gear and equipment.

3.    Operates in difficult work environments including but not limited to: conditions of high heat, low visibility, and confined space; on elevated ladders or apparatus; at accident scenes; and/or under adverse weather conditions.

4.    Acts as a member of a Fire Department medical unit crew and attends sick and injured persons as assigned.

5.    Carries or manually transports patients on a stretcher or to and from a stretcher.

[items 6-7, 10, 12 and 14 are not considered "essential functions"]

8.    Participates in drills, demonstrations, and courses related to equipment use, fire fighting techniques, and rescue procedures.

9.    Participates in the maintenance and care of quarters, equipment, tools, apparatus, and grounds.

11.   May drive a Fire Department ambulance as assigned.

13.   Acts in emergencies as Fire Equipment Operator or Fire Captain of a company as assigned.

15.   Assists in giving tours and demonstrations to the public.

16.   Assists in crowd control in emergency situations.

17.   Must be able to adhere to work schedule and hours assigned.

(Duties and Essential Functions, Pl.'s Ex. 70) (emphasis added).[6]

---

[6] Defendants submitted a January 4, 2010 City Firefighter Job Announcement containing a longer listing of "Firefighter Competencies and Essential Functions" in support of their Motion for Summary Judgment. (Defs.' Ex. 53.) Defendants' listing of essential functions is similar to that submitted by Plaintiff, however it also includes numerous generalized job requirements (e.g., no. 31, "Demonstrates an ability to assist in identifying and responding to the needs of customers and a commitment to continuous improvement of service"). The January 2010 date of this job-posting document post-dates much of the conduct at issue in the case. Defendants cite to the listing of essential functions for the proposition that firefighters are expected to follow the NFPA standards (Defs.' Mem. at 17) – an "essential function" not included in Plaintiff's list.

While the face of Plaintiff's submitted list of "Duties and Essential Functions" provides no information as to its source or date (the Affidavit of Adrianna Shannon describes it simply as "Duties and Essential Functions" [Doc. No. 168]), this particular document was identified in Defendants' Rule 30(b)(6) deposition as "the current listing" of Defendants' essential functions of the firefighter position. (Rule 30(b)(6) Dep. at 47, Pl.'s Ex. 97 (referring to Dep. Ex. 5, bates

An employer's position description and judgment in determining what is an "essential function" is a considered factor, and here, Defendants identify being able to drive a "Fire Department ambulance" as an essential function.  (Id.)  On the other hand, Plaintiff argues that driving emergency vehicles is not an essential function of the firefighter position and although Defendants require firefighters to possess a valid driver's license, they do not actually require all firefighters to drive departmental vehicles.  (Pl.'s Summ. J. Mem. at 44-45 [Doc. No. 167].)  Retired Deputy Fire Chief Robert Morrison testified that on a given day, with 90 firefighters on duty, approximately 10 would be assigned to drive an ambulance.  (Morrison Dep. at 24-25, Pl.'s Ex. 102.)

Another identified essential function requires firefighters to act as members of a medical crew and attend sick and injured persons.  It is in this context that Plaintiff has requested an accommodation in the event that providing medical care requires reading of small print, for instance, when dispensing medicine.  Defendants contend that the activity of reading is included within the essential function of providing medical care, whereas Plaintiff contends that any reading is incidental to the essential functions of the job.   Before the Court can even address whether Plaintiff is qualified to perform the essential functions of the firefighter position for purposes of Plaintiff's disability discrimination claims, there must clear, undisputed facts as to what constitutes the essential functions of the firefighter position.   Because these are genuine issues of material, disputed fact, in this regard, summary judgment is denied on Plaintiff's disability discrimination claims.

### i.        Reasonable Accommodation

---

number NKA000234).)  Therefore, for the purposes of discussing the "essential functions" of a firefighter in the context of the instant motions, the Court refers to Plaintiff's Exhibit 70.

As noted, the second element of a disability claim requires Eldredge to show that he is qualified to perform the essential functions of the firefighter position with or without reasonable accommodation.  The Court cannot resolve this issue because of the underlying dispute regarding the essential functions of the position.  However, assuming that reading fine print when providing medical care and driving a departmental vehicle are "essential functions," the question is then whether Plaintiff can perform those functions with or without reasonable accommodation.  While Plaintiff contends in his summary judgment brief that he can perform these essential functions of the firefighter position with <u>or without</u> accommodation, in his memorandum, Plaintiff focuses on the question of whether he can perform the essential functions of the position <u>with</u> accommodation.  (<u>See</u> Pl.'s Summ. J. Mem. at 41 [Doc. No. 167].)  Again, assuming that reading fine print and driving a departmental vehicle are essential functions of the firefighting position, while Plaintiff does not outright concede that he is unable to perform these functions without accommodation, the record here suggests that he cannot.  Plaintiff's own expert opines that he requires accommodation in order to perform certain functions of the firefighter position.  (Van Nostrand Report at 17, Pl.'s Ex. 88 (recommending that Plaintiff not drive an emergency vehicle and endorsing the use of a magnifying glass for any reading).)  Specifically, as to the fourth essential function requiring a firefighter to provide medical care, Eldredge's difficulty in reading small print compromises his ability to perform this aspect of the position without reasonable accommodation.  Likewise, the requirement of "may drive a Fire Department ambulance as assigned," is a requirement which requires accommodation, as supported by the medical record.  Moreover, in light of Eldredge's night-time driving restrictions, he would be legally unable to drive departmental vehicles in the evening.

The larger question is whether Eldredge can perform the essential functions of the firefighter position <u>with reasonable accommodation</u>.  Eldredge argues that the City failed to accommodate him because it refused to permit him to work as a firefighter with the aid of a magnifying glass and refused his request to not drive emergency vehicles.   As a secondary argument, Eldredge argues that Defendants failed to accommodate him by not permitting him to remain in the light-duty training position on a long-term basis.[7]  Again because of the underlying predicate dispute of fact as to the "essential functions" of the position, the issue of whether Eldredge is able to perform the essential functions of the firefighter position with reasonable accommodation cannot be resolved on summary judgment.

### ii.     Direct Threat

In addition, Defendants argue that Plaintiff is unqualified to perform the essential functions of the firefighter position because his vision condition poses a direct threat to the health and safety of others.   <u>See</u> 29 C.F.R. § 1630.2(r).  A direct threat means that an employee poses a significant risk of substantial harm to the health or safety to himself or others that cannot be eliminated or reduced by reasonable accommodation.  <u>Id.</u>  The determination that an individual poses a direct threat must be based on an individualized assessment of the individual's present

---

[7]  The Court finds that Eldredge's claims are factually distinguishable from those in <u>Cremeens v. City of Montgomery</u>, 2:09cv409-WHA, 2010 WL 3153721 (M.D. Ala. Aug. 9, 2010), in which an employee was deemed not "qualified" under the ADA, and therefore not entitled to accommodation.  In that case, an employee who was medically precluded from firefighting did not seek accommodation to perform firefighting duties, but instead sought accommodation to retain an investigator position.  The court found that the position of "fire investigator" required the ability to fight fires as an essential function of the job  – a function which the plaintiff conceded he could not perform.  <u>Id.</u> at *5, 7.  Here, Eldredge contends that he can perform the essential functions of firefighter, with reasonable accommodation.  That he also considers retaining the training position as an accommodation does not direct the result here, particularly as that is not his primary argument and also because <u>Cremeens</u>, a decision from the Middle District of Alabama, is not binding authority on this Court.

ability to safely perform the essential functions of the job.  Id.  "This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."  Id.  Here, in light of the disputed issue of fact concerning whether Plaintiff ever received an individualized assessment, this issue cannot be resolved on summary judgment.

### c.    Adverse Employment Action

Under the ADA and the MHRA, an adverse employment action is an action that "produces a material employment disadvantage," such as a termination, a constructive discharge, a cut in salary or benefits, or a "change[ ] that affect[s] an employee's future career prospects."  Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007) (internal quotations, alterations, and citations omitted).   Minor changes in working conditions, even if they are unpleasant or unwelcome, do not qualify as adverse employment actions, nor do complaints or negative comments, unless they lead to a material change in employment status.  Id.

Here, because the Court has found that disputes of material fact render this Court unable to rule on summary judgment on the disability claims, the Court need not, and does not, reach this issue.  However, the Court observes that the MDHR, in responding to Eldredge's second MDHR Charge, concluded

> that the respondent subjected the charging party to the adverse employment actions of placing the charging party on unpaid leave, attempting to terminate the charging party's employment, and requiring the charging party to perform a visually onerous "light duty" assignment (despite the charging party's visual impairment and the availability of more suitable personnel to perform this assignment).

(2009 MDHR Mem. at 4, Pl.'s Ex. 36.)  Again, without ruling on this issue, a reasonable jury could find that Defendants' repeated efforts at terminating Eldredge, along with other actions

identified above, qualify as adverse employment actions for purposes of the ADA and the

MHRA.

### 2.      Failure to Accommodate Claims

Eldredge alleges violations of the ADA, the 2008 Amendments to the ADA, and the

Minnesota Human Rights Act for failure to accommodate.  An employer violates the ADA if the

employer does "not mak[e] reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability who is an applicant or employee,

unless [the employer] can demonstrate that the accommodation would impose an undue hardship

on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A).  The ADA's

regulations state: "To determine the appropriate reasonable accommodation it may be necessary

for the [employer] to initiate an informal, interactive process with the [employee] with a disability

in need of the accommodation.  This process should identify the precise limitations resulting from

the disability and potential reasonable accommodations that could overcome those limitations."

29 C.F.R. § 1630.2(o)(3).  The EEOC's interpretive guidelines provide: "Once a qualified

individual with a disability has requested provision of a reasonable accommodation, the employer

must make a reasonable effort to determine the appropriate accommodation.  The appropriate

reasonable accommodation is best determined through a flexible, interactive process that involves

both the employer and the [employee] with a disability."  29 C.F.R. § 1630, App. § 1630.9.

The court considers claims for failure to accommodate using "a modified burden-shifting

analysis, because discriminatory intent is not at issue."  Mershon v. St. Louis Univ., 442 F.3d

1069, 1074 (8th Cir. 2006) (citation and internal quotation marks omitted).  Eldredge bears the

initial burden "only to show that the requested accommodation is reasonable on its face, i.e.,

ordinarily or in the run of cases." Peebles v. Potter, 354 F.3d 761, 768 (8th Cir. 2004) (citation

and internal quotation marks omitted).  Upon such a showing, the employer is left to "show

special (typically case-specific) circumstances that demonstrate undue hardship in the particular

circumstances."  Id.  Reallocating "the marginal functions of a job" may be a reasonable

accommodation; however, it is well settled that "[a]n employer need not reallocate or eliminate

the essential functions of a job to accommodate a disabled employee." Dropinski v. Douglas

Cnty., Neb., 298 F.3d 704, 710 (8th Cir. 2002).

 As to the flexible "informal interactive process" required for the employer and employee

to devise a reasonable accommodation, to demonstrate that the employer failed to participate in

the process, the employee must prove that "(1) the employer knew about the employee's

disability; (2) the employee requested accommodations or assistance for his or her disability; (3)

the employer did not make a good faith effort to assist the employee in seeking accommodations;

and (4) the employee could have been reasonably accommodated but for the employer's lack of

good faith." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999).  Although

the employer's failure to engage in the process does not amount to a per se finding of liability,

such failure can be considered prima facie evidence of bad faith.  Id.

 Plaintiff contends that he has shown that his requested accommodations (i.e., the use of a

magnifying glass and not driving a departmental vehicle) were reasonable on their face and that

Defendants refused to engage in the required interactive accommodation process.  Instead,

Eldredge contends, they rejected accommodations out of hand because Eldredge's disability is

permanent.  (See Butler Dep. at 19, Pl.'s Ex. 91 ("[W]e don't provide long-term disability jobs for

people who are permanently disabled.").)  Rule 30(b)(6) deponent Haltiner testified that

Defendants considered whether Plaintiff's job could be restructured in some way to accommodate his disability – although Defendants did not document those considerations – and they did not think of any ways in which Plaintiff's job could be restructured.  (Rule 30(b)(6) Dep. at 189-91, Pl.'s Ex. 97.)  Haltiner also testified during the Rule 30(b)(6) deposition that as to the requested accommodation regarding driving, Defendants determined that accommodating that request would pose a hardship on Defendants.  (Id. at 186.)  Haltiner testified, however, that at no time did Defendants conduct any type of staffing assessment to determine if other firefighters on the same shift could drive.  (Id. at 186-89.)   As to Plaintiff's request to use a hand magnifier as needed, Defendants apparently were of the belief that Plaintiff sought to use a magnifying glass in order to see everything around him (id. at 194), despite the many communications from Plaintiff in which he indicated that a magnifying glass would be used as needed for the limited times during which reading small print was necessary.

Here, genuine disputes of material fact remain regarding Plaintiff's reasonable accommodation claim.  Defendants' motion for summary judgment on this reasonable accommodation claim fails, as Plaintiff has clearly demonstrated issues of fact in dispute, including, among other things, whether Defendants engaged in the interactive reasonable accommodation process.   Defendants' level of  involvement, if any, in the interactive process is questionable, given their refusal to acknowledge the limited scope of Plaintiff's request for the accommodation of a magnifying glass.

Summary judgment on Plaintiff's motion is a closer question, however, as the requested accommodations are not unreasonable and have been suggested even by Defendants' physician evaluators.  (See, e.g., Hipp Report at 2, Ex. F to Pl.'s Daubert Mem. ("I would recommend that

he not drive a fire truck or ambulance;" "I believe that he can perform all of the functions of his

training position . . . ."); Zheng medical record of 9/11/06, Pl.'s Ex. 10 (recommending that

Plaintiff not drive a fire truck and not work in a safety-sensitive position).)   However, Defendants

have raised the issue of hardship and while the Court finds that Defendants have presented only

minimal evidence supporting their claims of hardship, genuine issues of material disputed fact

remain as to this claim and Plaintiff's motion for summary judgment is therefore denied.

### 3.      Retaliation Claims

The ADA and the MHRA prohibit employer retaliation against any employee due to the

employee's complaints about discrimination.  42 U .S.C. § 12203(a); Minn. Stat. § 363A.15.  To

establish a prima facie claim of retaliation, Eldredge must show that: (1) he engaged in statutorily

protected activity; (2) a materially adverse action was taken against him; and (3) the materially

adverse action was taken in retaliation for his engaging in protected activity.  Stewart v. Indep.

Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) (ADA test); Heisler v. Metro. Council,

339 F.3d 622, 632 n.6 (8th Cir. 2003) (claims under the MHRA follow the ADA test).  If

Eldredge can establish a prima facie case, the burden shifts to Defendants to show a legitimate,

non-retaliatory reason for the allegedly retaliatory action.  Stewart, 481 F.3d at 1043.  If

Defendants can make such a showing, the burden shifts back to Eldredge, who must then show

that Defendants' proffered reason was pretextual.  Id.

Plaintiff contends that his actions in filing a lawsuit for violations of the ADA and

MHRA, participating in the suit, and attending Rule 35 medical examinations and depositions

constitutes "protected conduct."  Eldredge maintains that Defendants have reduced his vacation

time and/or pay for participating in this lawsuit.  He also alleges that the City retaliated against

him through its repeated termination attempts.  Defendants respond, "But Eldredge was never terminated, he settled his license suspension claims, and any other adverse action was related only to his not being medically cleared to work as a firefighter or him not being qualified for the duties of being a firefighter."  (Defs.' Summ. J. Mem. at 30 [Doc. No. 154].)  Defendants do not appear to dispute that Eldredge engaged in protected conduct when he filed his MHRA charges, but because he was "never terminated" they contend that he suffered no adverse action.  In the factual context of this case, Defendants' position is strained, considering that Defendants have repeatedly tried to terminate Eldredge, only to be prohibited from doing so by the St. Paul Civil Service Commission.   Plaintiff has demonstrated ample material issues of disputed fact as to Defendants' motion for summary judgment on the retaliation claim and it is therefore denied.

As with other claims in this case, Eldredge's motion for summary judgment on the retaliation claim is a closer call.  Eldredge has demonstrated that he engaged in protected conduct and that Defendants took materially adverse action, e.g., the repeated threats of termination, and the issues involving vacation pay, against him.  As to the final element of showing that the materially adverse action was taken in retaliation for engaging in the protected activity, the MDHR found probable cause in 2009 that Defendants retaliated against Eldredge for some of the same protected conduct that is at issue in this litigation.  This is strong evidence in support of Plaintiff's claim.  However, Defendants argue that all attempts to terminate Eldredge were related to his inability to obtain medical clearance to perform the duties of a firefighter, citing to the NFPA standard.  Based on the conflicting, material evidence in the record, there is a genuine issue of material disputed fact, albeit slight, on this issue.

### B.      Plaintiff's **Daubert** Motion

Defendants seek to introduce the opinions of Drs. James Allen, Thomas Jetzer and Charles Hipp, who, in general, offer their respective opinions that Plaintiff is unable to perform the necessary duties of a firefighter because of his visual condition.  Plaintiff seeks to exclude Defendants' proposed testimony, arguing that Defendants are collaterally estopped from presenting evidence on this issue, and, if they are not estopped, Eldredge moves to exclude the experts' testimony on the merits.

### 1.      Collateral Estoppel

As noted, Plaintiff argues that the proposed experts' testimony is not relevant because the evidence is either identical to, or substantially similar to, Defendants' proffered testimony that the St. Paul Service Commission refused to admit on collateral estoppel grounds in their 2009 ruling. Collateral estoppel, or issue preclusion, bars issues from re-litigation in subsequent proceedings when:  (1) the party sought to be precluded in the second suit was a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded is the same as the issue involved in the prior action; (3) the issue sought to be precluded was actually litigated in the prior action; (4) the issue sought to be precluded was been determined by a valid and final judgment; and (5) the determination in the prior action was essential to the prior judgment.  Ginters v. Frazier, 614 F.3d 822, 826 (8th Cir. 2010).

The St. Paul Civil Service Commission decided after a full evidentiary hearing that Defendants failed to meet their burden of showing that Plaintiff was not competent to work as a firefighter.  However, the standard before that body and the standard before this Court are not precisely the same.  Within the context of the VPA, the St. Paul Civil Service Commission addressed whether Defendants could terminate Eldredge for one of two reasons – if, due to

incompetence or misconduct, he could not work as a firefighter.  See Minn. Stat. § 197.46.   Here,

the issues before this Court on Plaintiff's discrimination claims encompass a broader range of

underlying factual conduct and legal elements.  Although there are overlapping issues and

elements of proof, the issues here are not limited solely to whether or not Defendants can

establish incompetence.  Moreover, the ruling made by the St. Paul Civil Service Commission

was not that Plaintiff had successfully proven his competence to work as a firefighter, but that

Defendants had failed to meet their burden of proof to show – in  the context of the VPA – that

Eldredge was incompetent to perform his duties.   Here, Plaintiff bears the initial burden of proof

with respect to his claims.  The Court concludes that the issues were not identical before the St.

Paul Civil Service Commission, nor was the burden of proof, and collateral estoppel does not

apply.

### 2.      Defendants' Experts

Turning to the merits of Plaintiff's motion to exclude the testimony of Defendants' experts

Drs. Allen, Jetzer and Hipp, Eldredge contends that their proffered opinions fail to meet the

standards required by Fed. R. Civ. P. 702 and Daubert.

Dr. Allen, an ophthalmologist, conducted an Independent Medical Examination ("IME")

of Plaintiff  pursuant to Fed. R. Civ. P. 35 on two occasions.  During the first examination, Dr.

Allen's staff videotaped a peripheral field test of Plaintiff's vision.  (Allen Report of 4/30/10, Ex.

D to Pl.'s Daubert Mem.)  During the second examination, Dr. Allen's staff conducted the

following:  central field testing, video-taped examination of Plaintiff's eyes, color testing,

stereopsis testing and near vision testing.  (Allen Supp'l Report of 7/2/10, Ex. E to Pl.'s Daubert

Mem.)  Drs. Jetzer and Hipp also base their reports on a records review, including video footage

of Plaintiff passing his firefighter tests, and Dr. Hipp conducted a fitness-for-duty examination of

Eldredge.

Dr. Allen is an ophthalmologist with over 30 years of active medical practice and work

experience as an adjunct faculty member at the University of Minnesota, the President of the St.

Paul Eye Clinic, and the Medical Director of Midwest Surgery Center.  (Allen Report of 4/30/10

at 7, Pl.'s Ex. D to <u>Daubert</u> Mem.)  Based on his review of the medical record and his meeting

with Plaintiff, Dr. Allen believes, to a reasonable degree of medical certainty, that Plaintiff's

eyesight will not improve.  (<u>Id.</u> at 7.)  He found that while Eldredge has "very limited central

vision, he does have excellent peripheral vision," noting that persons with this condition have

"great difficulty reading."  (<u>Id.</u>)  Dr. Allen concluded, however, that Plaintiff "should be able to

perform many of the duties of a firefighter," including navigating through complex terrain and in

smoky and crowded buildings if the footing is regular, but that he would have difficulty with fine

visual tasks, such as reading.  (<u>Id.</u>)  Because of his limited vision and depth perception, Dr. Allen

recommended that Eldredge be restricted from working on ladders, scaffolding or at great heights.

Dr. Allen opined, "In my opinion, it would be in his best interest and also the best interests of his

co-workers to find a safer means of employment."  (<u>Id.</u>)

In his subsequent report, which was based on the previous information, as well as the

results of Dr. Allen's examination of Plaintiff and Plaintiff's responses to his questions, Dr. Allen

recorded that Plaintiff's best corrected vision was 20/200 in both the right and left eyes.  (Allen

Supp'l Report of 7/2/10 at 2, Ex. E to Pl.'s <u>Daubert</u> Mem.)  Dr. Allen concluded that Plaintiff was

color blind and legally blind, the latter caused by Stargardt's Disease.  He also found that Plaintiff

has a total loss of depth perception known as stereopsis.  Dr. Allen reiterated his previous opinion

that it would be in Plaintiff's best interest "to find a safer means of employment." (Id. at 3.)

Dr. Jetzer, an occupational health physician and Diplomat of the American Board of Occupational Preventative Medicine, is also the medical advisor at the Minneapolis-St. Paul Airport Fire Department and has served as the occupational medical physician for the Minneapolis Fire Department. (See Jetzer Report of 7/29/10 at 6, Pl.'s Ex. A to Daubert Mem.) In reaching his opinion, he reviewed Plaintiff's medical records, including Dr. Allen's two reports, as well as the 2007 NFPA standards. (Jetzer Dep. at 24, Ex. N to Pl.'s Daubert Mem.) At his deposition, he conceded that he had applied the NFPA standards for firefighter candidates, as opposed to members, to Eldredge, and could not explain why he had done so. (Id. at 50.) He agreed that the NFPA member standard was applicable to Eldredge. (Id.) Among his opinions, Dr. Jetzer found that Plaintiff is not qualified to perform firefighter duties. He believes that Plaintiff would not be qualified to perform such tasks as putting out fires in a smoke-filled room, watching for holes on roofs and hauling up ladders. (Jetzer Report of 7/29/10 at 6, Pl.'s Ex. A to Daubert Mem.) He also believes that heights pose a significant hazard for Plaintiff. (Id.)

Dr. Hipp, an occupational health physician and Diplomat of the American Boards of Internal, Preventive and Occupational Medicine, saw Eldredge in July 2008 for a fitness-for-duty examination. (Hipp Report of 7/17/08, Pl.'s Ex. F to Daubert Mem.) Dr. Hipp recounted Plaintiff's medical history, assessing "macular degenerative condition in both eyes, stable with permanent visual loss in the central retinal macular fields." (Id. at 2.) He found that in light of Plaintiff's visual impairments, he "clearly does not meet the NFPA 1582 visual acuity standard." (Id.) Dr. Hipp recommended that Plaintiff not drive a fire truck or ambulance and that he be restricted from active fire suppression in smoke-filled environments, where visual impairment

could implicate his safety or the safety of a team member.  (Id.)  However, Dr. Hipp found that

Eldredge "would be an excellent candidate on a fire team as a video recorder.  I also believe that

he can perform all of the functions of his training position that he did successfully for several

years before his recent time off of work."  (Id.)  Dr. Hipp did not believe that Eldredge's visual

impairment would pose an obstacle in working as a trainer.  (Id.)

Opinion testimony from an expert "qualified . . . by knowledge, skill, experience, training

or education" is admissible "[i]f scientific, technical, or other specialized knowledge will assist

the trier of fact" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony

is the product of reliable principles and methods, and (3) the witness has applied the principles

and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The Court, acting as a

"gatekeeper," must evaluate whether proffered expert testimony passes muster under Rule 702,

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597-98 (1993), bearing in mind that

the touchstone for admitting such testimony is assistance to the trier of fact.  See, e.g., Larson v.

Kempker, 414 F.3d 936, 941 (8th Cir. 2005).  Courts may allow expert testimony only when it is

both relevant and reliable, Daubert, 509 U.S. at 597-98, but "Rule 702 reflects an attempt to

liberalize the rules governing the admission of expert testimony," and "favors admissibility over

exclusion."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  Accordingly,

doubts regarding the usefulness of an expert's testimony should be resolved in favor of

admissibility, United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011), and "[g]aps in an

expert witness's qualifications or knowledge generally go to the weight of the witness's

testimony, not its admissibility."  Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th

Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure:

Evidence § 6265 (1997)).  "The exclusion of an expert's opinion is proper only if it is so

fundamentally unsupported that it can offer no assistance to the jury."  Wood v. Minn. Mining &

Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

> In screening expert testimony under Rule 702, a district court applies a three-part test.
>
> First, evidence based on scientific, technical, or other specialized knowledge must
> be useful to the finder of fact in deciding the ultimate issue of fact. This is the
> basic rule of relevancy. Second, the proposed witness must be qualified to assist
> the finder of fact. Third, the proposed evidence must be reliable or trustworthy in
> an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the
> assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

Plaintiff argues that the opinions of these experts are unreliable and irrelevant.  With

respect to Dr. Allen, Eldredge argues, for example, that he lacks expertise in firefighting skills.

Dr. Allen admitted in his deposition that he did not receive or review any information on NFPA

standards, did no research on firefighting, nor did he perform any specific testing of Plaintiff to

determine if he could navigate complex terrain.  (Allen Dep. at 52, 57, 59, Pl.'s Ex. M to Daubert

Mem.)  Plaintiff also argues that Dr. Allen's methods are scientifically unreliable.  As to Dr.

Jetzer, Plaintiff argues that the testimony of Dr. Jetzer, an occupational health physician, is

likewise irrelevant and unreliable because he did not personally examine Plaintiff and bases much

of his opinion on Dr. Allen's report.  (See Jetzer Dep. at 35, Pl.'s Ex. N to Daubert Mem.)

Eldredge also contends that Jetzer's methods are scientifically unrecognized.  Finally, regarding

Dr. Hipp's proposed testimony, Plaintiff argues that he is not qualified to testify as an expert in

either vision or firefighting and that his methods are unreliable and his conclusions are irrelevant.

The Court finds that the proffered opinions of Defendants' experts are sufficiently reliable

to be admitted under Rule 702 and Daubert.  Courts analyze reliability from a flexible, case-

specific standpoint.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-50 (1999).  Factors to be considered are whether the theory or technique can be or has been tested, whether it has been or is subject to peer review, and whether the theory or technique is generally accepted within the relevant scientific community.  Id.  All three experts are physicians, one an ophthalmologist, and the other two are occupational health specialists.  Their findings are based on a number of years of experience in their respective specialty fields, a review of the records, and in some instances, an examination of Plaintiff.  In the case of Dr. Jetzer, he also claims to have expertise or experience in working with firefighters and undergoing some of their training.  To the extent that Plaintiff finds their testimony lacking in credibility or reliability, Plaintiff's counsel is free to challenge such testimony on cross-examination.   Because they are practicing physicians, it is not surprising that their conclusions as to Mr. Eldredge have not been subject to peer review or publication, nor is this single factor fatal to their proffered testimony.[8]

While Eldredge disagrees with Defendants' experts' conclusions, his counsel may challenge those conclusions through rigorous cross-examination.  The Court is satisfied that Drs. Allen, Jetzer and Hipp are qualified to offer their opinions and that their proffered testimony sufficiently satisfies the reliability requirements of Daubert.

As to the relevance of the experts' proffered testimony, the Court finds that the proffered opinions are relevant.[9]  As with Plaintiff's experts, Defendants' experts will opine as to his

---

[8]  While Dr. Allen's opinions as to Mr. Eldredge have not been subject to peer review or publication, the Court notes that Dr. Allen has performed numerous IMEs and has previously testified by trial and deposition as an expert witness.  (Report of 4/30/10 at 8, Pl.'s Ex. D to Daubert Mem.)

[9]  The Court observes, however, that all of the records of these three experts contain references to Eldredge's refusal to submit to certain examinations during the initial IME with Dr. Allen and the three experts' reports accordingly refer to Plaintiff's level of 'uncooperativeness.'

medical condition and ability to work as a firefighter.   Such opinion evidence addresses the

central issue in this case, and is therefore relevant and will assist the trier of fact.

## III.    CONCLUSION

For the reasons set forth herein, the proffered testimony of Defendants' experts meets the

requisite standards of reliability and relevance and Plaintiff's motion to exclude it is denied.  In

addition, genuine disputes of material fact preclude granting the parties' motions for summary

judgment.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendants' Motion for Summary Judgment [Doc. No. 152] is **DENIED**;

2.    Plaintiff's Motion to Exclude Expert Testimony [Doc. No. 158] is **DENIED;** and

3.    Plaintiff's Motion for Summary Judgment on Liability [Doc. No. 165] is

**DENIED.**

Dated: August 15, 2011                              s/Susan Richard Nelson

SUSAN RICHARD NELSON
United States District Judge

---

As this Court previously ruled, "Defendants' own actions led to this result.  Defendants had
requested the medical examination at issue, but failed to provide either the Magistrate Judge or
Plaintiff with any specific details about the scope of that examination."  (Order of 1/21/11 [Doc.
No. 188].)  While the Court concludes that Defendants' reports meet the requisite standard for
relevance, any references to Plaintiff's refusal to submit to Dr. Allen's initial proposed IME,
which exceeded the scope of this Court's order, are not relevant and shall be redacted.  Likewise,
no testimony shall be elicited regarding Plaintiff's unwillingness to submit to any examination
beyond the scope of the order.